**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

**MARLA LIVINGSTON**

**VERSUS**

**MOREHOUSE COMMUNITY MEDICAL CENTERS INC**

**CASE NO.  3:25-CV-00481**

**JUDGE TERRY A. DOUGHTY**

**MAG. JUDGE KAYLA D. MCCLUSKY**

**MEMORANDUM RULING**

Before the Court is a Motion for Summary Judgment [Doc. No. 19] filed by Defendant, Morehouse Community Medical Center, Inc., d/b/a CommuniHealth Services ("CommuniHealth"). Plaintiff, Marla Livingston ("Livingston"), filed an opposition [Doc. No. 21]. CommuniHealth then filed a reply [Doc. No. 24].

For the reasons set forth, CommuniHealth's Motion is **GRANTED IN PART** and **DENIED AS MOOT IN PART**.

## I.    BACKGROUND

This case arises out of Livingston's claims of unlawful discrimination and retaliatory conduct under 42 U.S.C. §2000e-3(a) against CommuniHealth.[1] On February 6, 2023, Livingston received an offer from CommuniHealth to work as a Patient Access Clerk in West Monroe High School CommuniHealth Services Clinic ("WMHS Clinic").[2] Livingston accepted CommuniHealth's offer and began working at WMHS Clinic on February 20, 2023.[3] In her position, she served as a receptionist, registered new patients, kept office supplies stocked, and scanned medical records.[4]

---

[1] [Doc. No. 1, p. 1].
[2] [Id.].
[3] [Id. at p. 2].
[4] [Doc. No. 19-1, p. 5].

While Livingston was working at the WMHS Clinic, CommuniHealth received reports that she was inappropriately communicating with a student.[5] On May 22, 2024, Caitlin Mercer ("Mercer"), the Director of Human Resources, and Kacy Kraft, Livingston's supervisor, reprimanded Livingston for violating CommuniHealth policies by communicating with the student outside of the secure CommuniHealth Services ("CHS") communication platform.[6] The Corrective Action Report detailed that Livingston would be terminated if the incident occurred again.[7]

Livingston later transferred to West Monroe CommuniHealth Clinic ("West Monroe CHC").[8] Livingston alleges her coworkers, Emalyn Fulmer ("Fulmer"), Johnny Bryan ("Bryan"), and Dyell Daggs ("Daggs") (collectively, "coworkers"), began harassing her with sexually explicit comments, jokes, and innuendo shortly after she started working at West Monroe CHC.[9] She states that her coworkers pranked her, inquired about her sexual history, gave her a sexually themed gift, and made sexual comments to Livingston, causing her severe embarrassment, humiliation, and anxiety.[10]

Livingston filed a sexual harassment complaint against her coworkers with CommuniHealth on November 7, 2024.[11] The incident description in the complaint details how her coworkers joked multiple times that she would have to take a drug screening test, told her that her bloodwork appointment at the clinic would actually

---

[5] [Doc. No. 19-5, pp. 1–2].
[6] [Id.].
[7] [Id. at p. 2].
[8] [Doc. No. 21-7, ¶ 51:25].
[9] [Doc. No. 1, p. 2].
[10] [Id.].
[11] [Id.].

be a rectal exam, and made various other sexual comments to her.[12] While Livingston filed the complaint to alert CommuniHealth about her coworkers' concerning and discriminatory conduct, she asserts that CommuniHealth "took no adverse or corrective action against any of the coworkers named in [Livingston's] sexual harassment complaint."[13] In contrast to Livingston's assertions, CommuniHealth claims it immediately launched an investigation into Livingston's complaint the day after it was filed.[14] Mercer, in her role as Director of Human Resources, and Andrea Causey, Human Resources Business Partner (collectively, "HR") interviewed, on November 8, 2024, Livingston and her coworkers who made the inappropriate jokes.[15] During the interviews, HR confirmed some of Livingston's allegations that her coworkers made jokes of a sexual nature.[16]

After the initial interviews, HR discussed the matter with CommuniHealth's CEO, Katie Parnell ("Parnell").[17] On November 11, 2024, HR had a follow-up meeting with Livingston to assure Livingston that "her concerns were taken very seriously and addressed with her team members."[18] HR assured Livingston that CommuniHealth would make every effort to ensure she was not subjected to inappropriate joking again.[19] In the follow-up meeting with Livingston's coworkers, HR encouraged the group to be mindful of their joking and think about the

---

[12] [Doc. No. 19-6, p. 1].
[13] [Doc. No. 1, p. 2].
[14] [Doc. No. 19-7, pp. 1–5].
[15] [Id.].
[16] [Doc. No. 19-11, ¶¶ 24:21–25; 29:23–30:1; 34:9–24].
[17] [Doc. No. 19-13, ¶¶ 55:6–12]; [Doc. No. 19-1, p. 8].
[18] [Doc. No. 19-7, p. 4].
[19] [Id.].

appropriateness of their conversations because "[h]arassment is a very serious claim."[20] The investigation concluded with HR meeting with Livingston one more time to inform her that her complaints were addressed, that her coworkers apologized, and to encourage her to refrain from discussing intimate details of her life and maintain a professional relationship with her coworkers.[21]

Following the conclusion of the investigation, Livingston testified her coworkers did not continue to harass her and only spoke to her in a professional manner.[22] In December 2024, Mercer spoke to Livingston about potentially transferring to the Miller Roy Clinic for a "change of atmosphere."[23] Livingston testified she was hesitant about transferring to another clinic because "[she] loved it" at CommuniHealth and loved her job.[24]

Two months after Livingston filed a sexual harassment complaint, Mercer and Parnell received complaints about her behavior, lack of professionalism, and poor customer service on January 8, 13, and 27, 2025.[25] On January 8, Bryan, Livingston's coworker who was cited in her complaint, informed Mercer that Livingston reached out to his wife and "begged" for his wife to convince him to take Livingston back as a patient, but Livingston denied speaking to Bryan's wife.[26] On January 13, Mercer met with Bryan to discuss a complaint Livingston sent to Mercer on January 10 via

---

[20] [Id. at pp. 4–5].
[21] [Id. at p. 5]; [Doc. No. 19-10, ¶¶ 214:12–215:5].
[22]  [Doc. No. 19-10, ¶¶ 220:14–25].
[23] [Doc. No. 19-8, p. 2].
[24] [Doc. No. 19-10, ¶¶ 170:5–7].
[25] [Doc. No. 19-8, pp. 2–6].
[26] [Id. at p. 2].

Microsoft Teams.[27] When a patient became frustrated about unfilled medications, Livingston called Bryan's cell phone after he left the clinic, allegedly placed him on speakerphone, and had him explain to the patient why both medications could not be filled at the same time.[28] Bryan reprimanded Livingston the following morning to explain that calling him on speakerphone with patients wasn't professional and couldn't happen again.[29] Bryan told Mercer at this time that Livingston often left the front desk unattended, which disrupted workflow.[30] Mercer discovered upon speaking with Livingston that she communicated with patients outside of CHS communication platform, her second time violating CommuniHealth communication policies.[31] Mercer informed her to use the proper channels for patient/provider communication going forward.[32]

On January 27, 2025, Fulmer reported that Livingston led a drug representative who had brought lunch into the clinic's breakroom.[33] Bryan questioned who the drug representative was, and Livingston allegedly got upset, yelled that she didn't know and that no one tells her anything, slammed the door, and walked out.[34] When questioned by Mercer, Livingston responded that she acted out of frustration.[35] On the same day, Livingston allegedly interrupted Dr. David Hibbets' ("Dr. Hibbets") patient examination while the patient was partially undressed to restock tissues,

---

[27] [Id. at p. 4].
[28] [Id.].
[29] [Id.].
[30] [Id. at p. 5].
[31] [Id].
[32] [Id].
[33] [Id. at p. 6].
[34] [Id.].
[35] [Doc. No. 19-11, ¶¶ 68:1–4].

even though Mercer asserts that Livingston had been coached numerous times before not to interrupt exams unless absolutely necessary.[36] At the end of the day, Livingston allegedly turned off the lights in the clinic while Dr. Hibbets and patients were still inside.[37] While Mercer did not speak to Livingston to confirm the accuracy of the statements, she testified that she reviewed the camera footage to confirm Livingston interrupted a patient exam and turned off the lights.[38]

Livingston applied for a transfer to CommuniHealth's new clinic, the Miller Roy Clinic, which was set to open in February 2025.[39] While she was initially denied, CommuniHealth later approved the transfer.[40] On January 15, 2025, Mercer emailed Livingston the expectations and guidance for her new role at Miller Roy Clinic, including instructions to not leave the front desk unattended and  adhere to HIPAA privacy guidelines in all communications.[41] However, the transfer never occurred because Livingston was terminated prior to the opening of the new clinic.[42]

On January 29, 2025, Livingston was terminated from her position at the West Monroe CHC.[43] CommuniHealth's justified Livingston's termination because they found she was "not a good fit for the position"—even though she received a positive 90-day performance review and annual review and salary increases prior to the dismissal.[44] CommuniHealth's Corrective Action Report, documenting Livingston's

---

[36] [Id. at ¶¶ 68:20–24]; [Doc. No. 19-8, p. 6].
[37] [Doc. No. 19-8, p. 6]; [Doc. No. 19-11, ¶¶ 68:24–69:10].
[38] [Doc. No. 19-11, ¶¶ 69:11–25].
[39] [Doc. No. 19-10, ¶¶ 171:1–9].
[40] [Id. at ¶¶ 174:4–175:21].
[41] [Doc. No. 21-7, p. 55].
[42] [Doc. No. 19-9].
[43] [Doc. No. 1, p. 2].
[44] [Doc. No. 19-9, p. 1]; [Doc. No. 1, p. 3]; [Doc. No. 19-12, ¶¶ 23:7–8].

termination, stated the type of violation was "other" and the date of the incident was "ongoing."[45] Livingston asserts she was neither subjected to any disciplinary or corrective action, nor notified of any deficiencies in her work or performance, prior to her termination.[46]

Believing that she was terminated in retaliation for filing a sexual harassment complaint against her coworkers, Livingston filed a complaint with the United States Equal Opportunity Commission ("EEOC").[47] On March 13, 2025, the EEOC issued Livingston a Notice and Determination of Rights, and she timely filed suit before this Court.[48] Livingston's complaint alleges that she has suffered and continues to suffer severe embarrassment, humiliation, and anxiety as a result of CommuniHealth's willful and malicious violation of 42 U.S.C. § 2000e-3(a).[49]

CommuniHealth filed the instant Motion for Summary Judgment asserting there are no genuine issues of material fact, and therefore, it is entitled to judgment as a matter of law.[50] CommuniHealth argues that Livingston's retaliation claim must be dismissed at summary judgment because Livingston cannot establish causation, either as part of her *prima facie* burden or her ultimate burden of but-for causation.[51] Livingston opposes the Motion and argues Defendant did not have a legitimate reason to terminate her, and that Defendant began documenting alleged reasons only after

---

[45] [Doc. No. 19-9, p. 1].
[46] [Id.]; [Doc. No. 1, p. 2].
[47] [Doc. No. 1, p. 3].
[48] [Id.].
[49] [Id.].
[50] [Doc. No. 19, p. 1].
[51] [Doc. No. 19-1, p. 20].

she submitted her sexual harassment complaint.[52] She submits the close temporal proximity between the filing of her complaint and her subsequent termination two months later satisfies the causal connection element of her *prima facie* case for retaliation.[53] Livingston contends that in addition to the close temporal proximity, CommuniHealth's lack of a "legitimate reason for her termination" and the meticulous documentation of each incident of alleged misconduct made against Livingston only after she complained of sexual harassment establishes pretext.[54]

The issues are fully briefed, and the matter is ripe for ruling.

## II.    LAW AND ANALYSIS

### A.    Summary Judgment Standard

Courts must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *In re Genesis Marine, LLC*, 164 F.4th 448, 453 (5th Cir. 2026) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And a dispute about a material fact "is 'genuine' if the evidence is sufficient for a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson*, 477 U.S. at 248). Put differently, courts must grant summary judgment against a party who does not—or cannot—show "the existence of an element essential to that party's case, and on which that party will bear the burden

---

[52] [Doc. No. 21, p. 11].
[53] [Id. at p. 14].
[54] [Id. at p. 20].

of proof of trial." *Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 750 (5th Cir. 2023) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

The movant must first point to "particular parts of materials in the record," such as depositions, documents, electronic information, affidavits, interrogatories, etc., to show there is no genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1)(A). Once the movant does so, the burden shifts to the nonmovant who "must go beyond his pleadings and designate specific facts showing that there is a genuine dispute of material fact for trial." *Clark v. Dep't of Pub. Safety & Corr.*, 141 F.4th 653, 659 (5th Cir. 2025) (citing *Celotex*, 477 U.S. at 324)). The nonmovant cannot "defeat summary judgment with" metaphysical doubts as to the facts, "'conclusory allegations,' 'unsubstantiated assertions,' or 'only a scintilla of evidence.'" *In re Genesis Marine*, 164 F.4th at 453 (collecting cases).

Finally—and most importantly—when resolving summary judgment motions, "courts may not evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes" and must resolve all ambiguities and draw all permissible inferences "in favor of the non-moving party." *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (citation modified) (citing *Anderson*, 477 U.S. at 255).

### B.    Livingston's Hostile Work Environment Claim

CommuniHealth's Motion seeks summary judgment on Livingston's hostile work environment and retaliation claims.[55] In her opposition, Livingston clarifies that while she mentioned hostile work environment allegations in her deposition, she

---

[55] [Doc. No. 19-1, p. 5].

is not asserting a hostile work environment claim.[56] Accordingly, the Court finds CommuniHealth's Motion, as it pertains to the hostile work environment claim, is **DENIED AS MOOT**.

### C.      Livingston's Retaliation Claim

Title VII "prohibits an employer from discriminating against an employee … because that individual made a charge, testified, assisted, or participated in a Title VII proceeding or investigation." *Ladner v. Walmart*, 834 F. App'x. 893, 895–96 (5th Cir. 2020). The two categories of protected activity under Title VII are: "1) opposition to any practice rendered unlawful by Title VII ("opposition clause"), and 2) making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII ("participation clause")." *Rodrigue v. PTS Mgmt. Grp., LLC*, 550 F. Supp. 3d 376, 400 (W.D. La. 2021). Where the retaliation claim is "based on circumstantial evidence, we apply the *McDonnell Douglas* framework." *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577 (5th Cir. 2020) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)).

*McDonnell Douglas* provides a three-step framework for analyzing retaliation claims. First, the plaintiff must establish a *prima facie* case of unlawful retaliation. *Brown*, 969 F.3d at 577. Second, if the plaintiff successfully establishes a *prima facie* case, the burden shifts to the defendant to produce a legitimate, nonretaliatory reason for the adverse employment action. *Id.* Finally, if the defendant makes this showing, the burden shifts back to the plaintiff to prove that the proffered reason was pretext

---

[56] [Doc. No. 21, p. 12].

for unlawful retaliation. *Id.* To survive a motion for summary judgment, the plaintiff must demonstrate "a conflict in substantial evidence on the question of whether the employer would not have taken the adverse employment action but for the protected activity." *Id.* (internal quotations omitted).

### 1.   *Prima Facie* Case of Retaliation

An employee establishes a *prima facie* case for unlawful retaliation by proving: (1) that she engaged in activity protected by Title VII; (2) that an adverse employment action occurred; and (3) that a causal link existed between the protected activity and the adverse employment action. *Rayborn v. Bossier Parish Sch. Bd.*, 881 F.3d 409, 415 (5th Cir. 2018).

CommuniHealth does not dispute that Livingston engaged in protected activity by filing a sexual harassment complaint or that she suffered an adverse employment action when she was terminated. It maintains, however, that she cannot establish the required causal link, either as part of her *prima facie* burden or her ultimate burden of but-for causation.[57] Turning first to causation at the *prima facie* stage, "a plaintiff can meet his burden of causation by showing close enough timing between his protected activity and his adverse employment action." *Brown*, 969 F.3d at 577 (citing *Garcia v. Pro. Contract Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019)). "Temporal proximity between protected activity and an adverse employment action, by itself, does not constitute sufficient evidence to satisfy the prima facie burden unless that proximity is 'very close.'" *Everett v. Cent. Miss., Inc. Head Start Program*,

---

[57] [Doc. No. 19-1, p. 19].

444 F. App'x. 38, 46 (5th Cir. 2011) (citing *Clark County School Dist. v. Breeden,* 532 U.S. 268, 273 (2001)).

The Fifth Circuit in  *Garcia v. Professional Contract Services, Inc.*, stated that up to four months could "cause there to be an inference of proximity of causation from proximity in time." 938 F.3d at 243. The Supreme Court in *Breeden* later narrowed the period by approvingly citing a case that held three months was insufficient to support causation. *Breeden*, 532 U.S. at 273. However, even very-close temporal proximity does not establish causation as a rule. *Ladner* 834 F. App'x. at 897. The Fifth Circuit maintains that even at the *prima facie* stage, temporal proximity can only establish a causal link when it is connected to the decision maker's knowledge of the protected activity. *Dearman v. Stone Cnty. Sch. Dist.*, 832 F.3d 577, 582 (internal quotations omitted).

Here, Livingston filed her complaint with CommuniHealth on November 7, 2024, and was terminated eighty-three days later on January 29, 2025. Mercer discussed the investigation into Livingston's sexual harassment complaint with Parnell, who subsequently signed Livingston's termination paperwork.[58] As this eighty-three-day period fits comfortably within the time frames recognized by both the Fifth Circuit in *Garcia* and the Supreme Court in *Breeden* to establish causation, and because Parnell had knowledge of Livingston's protected activity, the Court concludes that Livingston has made a *prima facie* showing of retaliation.

### 2.    CommuniHealth's    legitimate,    non-discriminatory reason for the adverse employment action

---

[58] [Doc. No. 19-13, ¶¶ 55:6–12]; [Doc. No. 19-1, p. 8]; [Doc. No. 19-9, p. 2].

Page **12** of **20**

Because Livingston has established a *prima facie* case of retaliation, the burden shifts to CommuniHealth to articulate a legitimate, non-retaliatory reason for its actions. *Brown* 969 F.3d at 577. While the defendant's reason for termination must be clear and reasonably specific, the burden on the defendant is one of production, not persuasion. *Shahrashoob v. Tex. A&M Univ.*, 125 F.4th 643, 653 (5th Cir. 2025). The Fifth Circuit has held "poor work performance" is a legitimate, non-discriminatory reason for terminating an employee when coupled with specific examples cited in the briefs that predate the termination decision and were known to the decisionmaker at the time of the termination decision. *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 232–33 (5th Cir. 2015). The Southern District of Texas, in *Mitchell v. University of Houston,* found an employer's termination reasoning that an employee was "a poor fit for her position"—when coupled with specific examples of performance and attendance issues in the motion for summary judgment—constituted a legitimate, nondiscriminatory reason for discharge. No. 23-837, 2024 WL 4438663, at * 9 (S.D. Tex. Oct. 7, 2024).

Here, CommuniHealth states it terminated Livingston because she lacked good decision-making skills, she had difficulty communicating with business partners, and she barged into occupied patient exam rooms.[59] Parnell testified Livingston "did not have the cognitive ability to make good decisions, and she proved it over and over and over again in [the] workplace."[60] Parnell did not vocalize this justification to Livingston as she did not want to tear Livingston down; rather,

---

[59] [Doc. No. 24-5, ¶¶ 76:1-3; 22].
[60] [Id. at ¶¶ 77:7–10].

Parnell testified not being a good fit was the "easiest way for [her] to sum [] up" the issues with Livingston's employment.[61] Livingston does not dispute that this explanation constitutes a legitimate, non-retaliatory reason for termination; instead, she skips to the final step of the *McDonnell Douglas* framework to establish pretext.[62]

Accordingly, the Court finds CommuniHealth has satisfied its burden of production, and its proffered reason for termination—that Livingston was not a good fit—is legitimate and non-discriminatory.

### 3.    Livingston fails to establish CommuniHealth's reason for termination was pretext

Because CommuniHealth has produced a legitimate, non-retaliatory reason for Livingston's termination, the presumption of retaliation created by the *prima facie* case disappears. Livingston must now present evidence that CommuniHealth's proffered explanation is false and merely a pretext for retaliation. *See McDonnell Douglas*, 411 U.S. at 804. Pretext can be proven by any evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action. *Brown* 969 F.3d at 578. To satisfy the final step of the *McDonnell Douglass* test and survive a motion for summary judgment, the plaintiff must demonstrate "a conflict in substantial evidence" on the question of whether the employer would not have taken the adverse employment action "but for" the protected activity. *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 561 (5th Cir. 2019) (quoting *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 658 (5th Cir. 2012)).

---

[61] [Id. at ¶¶ 77:7–17].
[62] [Doc. No. 21, p. 15].

Page **14** of **20**

Pretext is established "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Thomas v. Johnson*, 788 F.3d 177, 179 (5th Cir. 2015) (quoting *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)), *cert. denied*, 136 S. Ct. 822 (2016). While temporal proximity alone is enough to meet the burden of causation to establish a *prima facie* case of retaliation, temporal proximity is "relevant to, but not alone sufficient" to show a defendant's neutral explanation was pretext. *Brown* 969 F.3d at 579; *see also Shahrashoob*, 125 F.4th at 653–54 (recognizing that a plaintiff can show pretext through temporal proximity plus significant record evidence).

Therefore, the Court must consider whether Livingston's other evidence, in combination with this temporal proximity, is sufficient for a reasonable jury to find but-for causation. Factors to consider include: the strength of plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered. *Brown* 969 F.3d at 578.

CommuniHealth argues Livingston can't meet her ultimate but-for causation burden because "even if Livingston had not submitted a harassment complaint, she still would have been terminated because her actions on and leading up to January 27, 2025, created the situation that made her employment untenable."[63]

Livingston has offered no evidence to the contrary. In fact, when asked what events between her complaint and her termination led her to believe the two events

---

[63] [Doc. No. 19-1, p. 21].

were linked, Livingston testified: "I honestly don't know."[64] After the investigation into her sexual harassment complaint concluded, Livingston testified she "loved [her] job" at CommuniHealth and initially did not want to leave for the new opening at the Miller Roy Clinic, but became "all for it" when Mercer encouraged her to transfer as a fresh start.[65] Her only support that CommuniHealth's reason for termination is pretext is that CommuniHealth "began meticulously documenting each incident of alleged misconduct made against Ms. Livingston and treated each incident as if it were true despite evidence to the contrary" after she filed her complaint in order to "create a paper trail to support Ms. Livingston's termination."[66]

The Court finds Livingston's paper trail argument unpersuasive for two reasons. First, CommuniHealth issued a written warning to Livingston five months prior to her reporting sexual harassment.[67] The Corrective Action Report detailed Livingston was told "she should not interact with any patient via text message or social media or any other non-secure, non-CHS communication platform per CHS's policies."[68] The Corrective Action Report detailed that Livingston would be terminated if the incident occurred again.[69] Second, Livingston does not refute CommuniHealth's examples how she was not a good fit to continue working at the West Monroe CHC due to complaints that she often left the front desk, improperly

---

[64] [Doc. No. 19-10, ¶¶ 261:13–16].
[65] [Doc. No. 21-6, ¶¶ 170:1–10].
[66] [Doc. No. 21, p. 20].
[67] Doc. No. 19-5, pp. 1–2].
[68] [Id. at p. 2].
[69] [Id.].

communicated with patients outside of the CHS portal in violation of HIPAA, and inappropriately called Bryan on speakerphone to speak with a patient after hours.[70]

While Livingston does not deny the above, she claims that the events of January 27—which CommuniHealth cites as the final straw cementing its belief that she was not a good fit—are false.[71] Specifically, Livingston denies that she entered into an occupied patient room to restock tissues, and later turned off all the lights at the West Monroe CHC while patients were in the building.[72] Whether Livingston did or did not, in fact, commit those violations would require this Court to make a credibility determination, which is impermissible at the summary judgment stage.[73] *See Guzman*, 18 F.4th at 160 (citation omitted). In pretext cases, however, "[a] factual dispute over the employee's innocence of allegations against her is not enough to survive summary judgment; the plaintiff must put forward evidence sufficient to create a factual dispute as to whether or not the defendant subjectively believed that the allegations were true." *Lucas v. T-Mobile USA, Inc.*, 217 F.Supp. 3d 951, 957 (S.D. Tex. Nov. 21, 2016); *see also Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) ("The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive.").

Here, Dr. Hibbets testified Livingston entered into an exam room while he was there with a patient and turned off the lights to the entire clinic while he and patients

---

[70] [Doc. No. 19-8, p. 5]; [Doc. No. 21-7, ¶¶ 41:19–22; 63:12–65:6].
[71] [Doc. No. 21, p. 18].
[72] [Doc. No. 21-10, ¶¶ 9–10].
[73] [Doc. No. 21, p. 20].

were in the building.[74] Mercer and Parnell were able to corroborate Dr. Hibbets' testimony after viewing the West Monroe CHC's security camera footage.[75] The only evidence Livingston puts forth against the testimony of Mercer, Parnell, and Dr. Hibbets is a self-serving affidavit that the events on January 27 did not happen.[76] As this is Livingston's only evidence to the contrary, the Court finds this is insufficient to create a triable issue of fact and Livingston has not demonstrated CommuniHealth's proffered explanation for termination is false. *See United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001) (affirming summary judgment for the plaintiff when defendant's only evidence in opposition was his own "self-serving allegations"); *BMG Music v. Martinez*, 74 F.3d 87, 91 (5th Cir. 1996) (explaining that a "conclusory, self-serving statement" by defendant was insufficient to create a triable issue of fact).

Furthermore, the CommuniHealth handbook details employment at CommuniHealth is "at will," which means "the employee or the company can terminate employment at any time, with or without cause, unless a specific employment contract states otherwise."[77] As such, CommuniHealth's justification that Livingston was simply not a good fit aligns with the principle of at-will employment, under which CommuniHealth could fire Livingston "for any reason— good, bad, or indifferent—or for no reason at all." *Johnson v. Delchamps, Inc.*, 897 F.2d 808, 810 (5th Cir. 1990).

---

[74] [Doc. No. 24-7].
[75] [Doc. No. 19-15, ¶¶ 68:10–25]; [Doc. No. 19-11, ¶¶ 69:22–25].
[76] [Doc. No. 21-10, p. 2].
[77] [Doc. No. 19-2, p. 19].

The Court finds Livingston has not cited evidence from which a reasonable jury could conclude that CommuniHealth's decision that she wasn't a good fit for her position was not the real reason for her termination, and that the reasons for her termination are not pretext for retaliation. The Court concludes that Livingston has failed to raise a genuine issue of material fact for trial on her retaliation claim.

### III.    CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Defendant CommuniHealth's Motion for Summary Judgment [Doc. No. 19] is **GRANTED IN PART AND DENIED AS MOOT IN PART**.

**IT IS FURTHER ORDERED** that Defendant CommuniHealth's Motion as to Livingston's hostile work environment is **DENIED AS MOOT** as she has not asserted this claim.

**IT IS FURTHER ORDERED**, **ADJUDGED**, **AND DECREED** that Defendant CommuniHealth's Motion is **GRANTED** as to Livingston's retaliation claim, and Livingston's claims against CommuniHealth are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that because the Court has concluded that CommuniHealth is entitled to summary judgment on all of Livingston's claims, CommuniHealth's Motion in Limine [Doc. No. 25] is **DENIED AS MOOT**.

MONROE, LOUISIANA, this 8th day of July 2026.

_____
TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE